**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

CHAZ PINKSTON                                                         PLAINTIFF

V.                                                          NO. 4:17-CV-39-DMB-DAS

MISSISSIPPI DEPARTMENT OF
CORRECTIONS, et al.                                                  DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This prisoner civil rights action is before the Court on the motion for summary judgment

filed by "Dr. H. Kuiper," "Nurse L. Barron," and Centurion of Mississippi, LLC, Doc. #65; which

the Mississippi Department of Corrections, Pelicia Hall, Steven Anderson, Robert Benford, and

Keba Taylor joined, Doc. #67.

**I**
<u>**Procedural History**</u>

On or about March 24, 2017, Chaz Pinkston, acting pro se, filed a complaint in the United

States District Court for the Northern District of Mississippi, naming as defendants (1) the

Mississippi Department of Corrections ("MDOC"); (2) "Nichols," a captain at the Mississippi

State Penitentiary ("MSP"); (3) Keba Taylor, a lieutenant at MSP; (4) "S. Anderson," later

identified as Steven Anderson,[1] a sergeant at MSP; (5) "Centurion," later identified as Centurion

of Mississippi, LLC,[2] a contractor at MSP; (6) "Dr. Kuiper," later identified as Dr. H. Kuiper,[3] a

doctor at MSP; and (7) "Ms. Barron," later identified as L. Barron,[4] a registered nurse at MSP.

---

[1] Doc. #27.

[2] Doc. #30.

[3] Doc. #31.

[4] Doc. #29.

Doc. #1.  With leave of this Court, Pinkston subsequently filed three amended complaints—one to add Pelicia Hall as a defendant, Doc. #13; one "to say Captain Benford, instead of Captain Nichols,"[5] Doc. #19; and one to clarify that he is asserting a due process claim, *see* Docs. #40, #43.

On August 14, 2017, following a *Spears* hearing, United States Magistrate Judge David A. Sanders issued an order directing the defendants to answer the complaint, as amended, by September 5, 2017.  Doc. #16 at 1.

Taylor did not file an answer by September 5, 2017.  On or about September 6, 2017, Pinkston filed against Taylor a motion seeking entry of default and a motion for default judgment.  Doc. #35; Doc. #36.  On September 13, 2017, Taylor, without seeking leave of the Court, filed an untimely answer.  Doc. #37.  The same day, Judge Sanders denied Pinkston's motion for entry of default on the ground that this Court likely would not grant a default judgment because Taylor filed an answer and because the Prison Litigation Reform Act ("PLRA") does not allow for entry of a default judgment.  Doc. #38.

On December 5, 2017, Barron, Centurion, and Kuiper ("Centurion Defendants") filed a joint motion for summary judgment.  Doc. #65.  The same day, MDOC, Hall, Anderson, Benford, and Taylor ("MDOC Defendants") filed a "Joinder" regarding the motion for summary judgment.[6] Doc. #67.  The motion for summary judgment has been fully briefed.  Doc. #94; Doc. #99.

---

[5] "Captain Benford" was later identified as Robert Benford.  Doc. #26.

[6] As a general rule, "motions of joinder must at the very least point the Court to those specific portions of the other motion to which the Defendants join and supply additional facts or legal theories where necessary. Otherwise the Court and Plaintiff are, as is the case here, left with a blanket joinder that provides no specific guidance." *Gottesman v. Santana*, No. 16-cv-2902, 2017 WL 2882214, at *4 n.5 (S.D. Cal. July 6, 2017) (emphasis omitted).  Because the MDOC Defendants have made absolutely no effort to attempt to tie their request for relief to those requests for relief in the Centurion Defendants' summary judgment motion, the Court is inclined to deny the joinder.  However, given the near parallel issues between the defendants, the Court will, in the interest of judicial efficiency, allow the requested joinder. The MDOC Defendants are cautioned against employing a similar practice in the future.

On January 3, 2018, this Court vacated Judge Sanders' order denying default and directed the Clerk of the Court to enter default against Taylor. Doc. #79. The Clerk entered default the same day. Doc. #80. Six days later, Taylor filed a motion to set aside default, Doc. #81, which this Court granted on March 5, 2018, on the ground that Taylor was never served with process, Doc. #103.

On or about February 16, 2018, Pinkston filed a "Motion for Leave to File Motion for Temporary Restraining Order and a Preliminary Injunction," Doc. #100, which is in substance a motion for injunctive relief "to ensure that he receives proper medical treatment and care to counteract prison staff['s] wanton infliction of pain by cruel and unusual punishment," Doc. #101 at 1 (quotation marks omitted). Approximately three weeks later, on or about March 5, 2018, Pinkston filed an "Emergency Motion" which, though less than clear, appears to be both a supplement to Pinkston's motion for injunctive relief, and a supplement to Pinkston's response to the motion for summary judgment.[7] Doc. #104.

On or about March 13, 2018, Pinkston filed two documents which are, in substance, motions for sanctions against the defendants. Doc. #107; Doc. #108. About a week later, Pinkston filed a motion for reconsideration of this Court's order setting aside default. Doc. #110.

## II
## Motion for Reconsideration

In his motion for reconsideration, Pinkston asks this Court to reinstate default, and enter default judgment against Taylor.

### A. Standard

Federal Rule of Civil Procedure 54(b) "allows parties to seek reconsideration of

---

[7] Document #104 appears as a motion on this Court's CM/ECF system. The Clerk of the Court will be directed to remove the document's motion designation.

interlocutory orders ….”[8] *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). Under

Rule 54(b):

> [A]ny order or other decision, however designated, that adjudicates fewer than all
> the claims or the rights and liabilities of fewer than all the parties does not end the
> action as to any of the claims or parties and may be revised at any time before the
> entry of a judgment adjudicating all the claims and all the parties' rights and
> liabilities.

Fed. R. Civ. P. 54(b).

> Although the source of the court's authority to revise or amend an order or
> judgment is different for interlocutory orders than for final orders or judgments,
> many of the same policy considerations apply both to motions for reconsideration
> under Rule 54(b) and to motions for reconsideration under Rule 59(e). Accordingly,
> district courts … frequently apply the same standards to the two.

*eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F.Supp.2d 745, 748 (E.D. Tex. 2012)

(collecting cases).

> Under Fifth Circuit jurisprudence:
>
> A Rule 59(e) motion “calls into question the correctness of a judgment.” This Court
> has held that such a motion is not the proper vehicle for rehashing evidence, legal
> theories, or arguments that could have been offered or raised before the entry of
> judgment. Rather, Rule 59(e) “serves the narrow purpose of allowing a party to
> correct manifest errors of law or fact or to present newly discovered evidence.”

*Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (citations and alterations

omitted). “A motion to alter or amend the judgment under Rule 59(e) must clearly establish either

a manifest error of law or fact or must present newly discovered evidence and cannot be used to

raise arguments which could, and should, have been made before the judgment issued.” *Schiller*

*v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (internal quotation marks omitted).

Additionally, “a trial court is free to reconsider and reverse interlocutory orders for any reason it

---

[8] Orders setting aside default and denying default judgments are considered interlocutory. *Sheppard v. Dewberry*, 574
F. App'x 427, 427 (5th Cir. 2014) (denial of default judgment interlocutory); *Parson v. Wilmer Hutchins Indep. Sch.
Dist.*, 112 F. App'x 995, 2004 WL 2634532, at *1 (5th Cir. 2004) (setting aside default judgment interlocutory).

deems sufficient, even in the absence of new evidence or an intervening change or in clarification of the new law." *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727–28 (5th Cir. 2012) (internal alterations omitted).

## B.  Analysis

Pinkston argues that reconsideration is necessary because Taylor waived the defense of improper service by filing his answer and because Taylor had independent knowledge of the lawsuit without service.

First, a "defendant's actual notice of … litigation … is insufficient to satisfy Rule 4's [service] requirements." *Way v. Mueller Brass Co.*, 840 F.2d 303, 306 (5th Cir. 1988). Furthermore, while it is true that failure to include improper service in an answer results in waiver of the defense,[9] pleadings filed without leave of court are "[w]ithout legal effect." *U.S. ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 296 (5th Cir. 2003).  Thus, an untimely answer is a nullity. *In re Legal Xtranet, Inc.*, No. 11-51042, 2011 WL 3652756, at *4 (Bankr. W.D. Tex. Aug. 19, 2011) ("[B]ecause AT&T failed to obtain leave of court before filing its untimely Amended Answer, the Amended Answer is a nullity and the original Answer remains the live pleading."). It follows, therefore, that a defense may not be waived by an untimely answer.  Accordingly, Taylor's untimely answer did not waive the right to object to service in opposing default judgment, and Pinkston's argument to the contrary is rejected.  The motion for reconsideration will be denied.

## III
## Motions for Sanctions

Pinkston seeks sanctions in the form of dismissal of the pending motion for summary judgment and the related joinder.  As grounds for this relief, Pinkston contends the MDOC

---

[9] *See* Fed. R. Civ. P. 12(h).

Defendants filed their joinder after the deadline for joinder of parties set in the scheduling order governing this case. Pinkston further alleges that the Centurion Defendants: (1) by filing exhibits in support of their motion for summary judgment, "filed their discovery on December 5th, 2017," after the discovery deadline; (2) responded to motions related only to the MDOC defendants; (3) supplemented their discovery disclosures after the discovery deadline; and (4) replied in support of the motion for summary judgment without seeking leave of the Court. The Court has reviewed Pinkston's contentions and finds that none of the conduct identified by Pinkston violates an applicable rule or order, much less justifies the sanction of dismissing a dispositive motion. Accordingly, the motions for sanctions will be denied.

## IV
## Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[10] *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

---

[10] In their motion for summary judgment, the Centurion Defendants note that "[d]espite being granted leave to file an amended complaint, Pinkston has not served an amended complaint on the Centurion Defendants. Nevertheless, out of an abundance of caution, the Centurion Defendants will address this claim in this motion." Doc. #66 at 2. The Centurion Defendants have not, however, moved to dismiss for insufficient service. Even if they had, such a motion would be denied. As clearly stated in this Court's order granting leave to amend, Pinkston was not granted leave to *add* a claim, but rather, to *clarify* a claim he was already asserting. *See* Doc. #43.

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## V
## Factual Background

On or about July 18, 2016, Pinkston was admitted to the hospital unit of MSP after going on a hunger strike at the Wilkinson County Correctional Facility and experiencing a documented eleven-pound weight loss. Doc. #65-2 at 8–10, 14. Pinkston was diagnosed with Narcissistic Personality Disorder following an initial psychiatric review by an MSP psychiatrist but was not placed on any psychiatric medication. *Id.* at 7, 22.

Within days of his transfer to MSP, Pinkston stated that he was on a hunger strike in order to get medical treatment for his dry skin. *Id.* at 26. The specific medical treatment he requested was Eucerin lotion and A&D ointment. *Id.* Pinkston was advised that Eucerin cream was non-formulary[11] and could not be provided. *Id.* At that time, however, Pinkston was given a new order

---

[11] Neither party has defined "formulary" or "non-formulary," nor described who makes such determinations and whether a request may be made for non-formulary drug approval. A "formulary" may be defined as "a listing of prescription drugs approved for use." *See Formulary*, MEDTERMS MEDICAL DICTIONARY,

to apply A&D ointment to his dry skin twice daily. *Id*. at 26–27. He was also later provided with medicated shampoo after he complained of an itchy scalp. *Id*. at 209.

Because of the hunger strike, Pinkston was placed under continuous observation until at least September 20, 2016. *See generally id*. at 5–266. Pinkston often complained to medical providers during their daily rounds, asserting that dissatisfaction with his diet and skin treatment options were the reasons for his hunger strike. *See, e.g., id*.at 6, 26, 28, 31, 40, 69, 72–73, 76, 82-83, 91, 104, 112, 119, 140, 199.

Sometime in August 2016, medical staff began to suspect that Pinkston was at least partially faking his hunger strike. *See, e.g., id*. at 148–49. It was documented that he asked for food from other inmates and attempted to have prison staff sneak him food. *Id*. at 149, 216, 225–27, 231. Medical notes recorded during this time indicate that Pinkston would often request extra or specific foods.[12] Pinkston "became angry with outbursts" when he was confronted about hiding and sneaking food. *See id*. at 156.

Pinkston was discharged from the infirmary on September 7, 2016. *Id*. at 254–55. When signing the discharge papers, the psychiatrist updated his chart from "alleged hunger strike" to "alleged hunger strike with malingering." *Id*. at 254. No psychotropic medications were prescribed. *Id*. at 255. Although Pinkston was discharged from the infirmary, he remained at the MSP hospital because staff there had not received a confirmation as to his placement. *Id*. at 258.

---

https://www.medicinenet.com/script/main/art.asp?articlekey=16737 (last visited July 24, 2018). In the context used by the parties, it appears a "formulary" medication is a drug that has been approved for distribution at the MSP hospital.

[12] *See* Doc. #65-2 at 96 (noting Pinkston eats except when he complains of not getting enough food and wants to manipulate more), 145 (noting Pinkston wanted peanut butter sandwich or Ensure to supplement diet), 149 (noting Pinkston asked in secret for second tray), 153 (noting Pinkston ate two trays), 159 (noting Pinkston was hoarding trays under his bed), 166 (noting Pinkston had snack of sandwich and milk even though he said on he was hunger strike), 216 (noting Pinkston continues to refuse lunch trays but begs for food from other inmates), 228 (noting Pinkston refused lunch but requested peanut butter sandwich), 235 (noting Pinkston requested extra sandwiches and Ensure), 248 (noting Pinkston requested extra food), 249 (noting Pinkston requested extra sandwich at night).

On September 8, 2016, Pinkston was described as "anxious" about his potential placement. *Id*.

On September 13, 2016, a nurse was unable to conduct evening rounds because an officer was not available to escort her. *See id*. at 262. However, Pinkston received his scheduled medications and diet tray at approximately 9:30 p.m. that evening. *Id*.

Pinkston claims that he awoke on September 14, 2016, with six large boils on his inner thigh. Doc. #1 at 6. He claims that he asked both Barron and Kuiper to look at the boils while they were making rounds and that both ignored him and instructed other staff members not to treat him. *See id*. at 5–6. When Barron made rounds at 8:00 a.m., she noted that Pinkston began shouting, "imitating animal sounds" and "kicking on [his cell] door." Doc. #65-2 at 262. When she returned at 11:20 a.m., she noted that Pinkston asked an officer to open the cell door so that he could "knock [her] out" and threatened to kill her. *Id*. According to Pinkston, other inmates began to yell too regarding his need for medical treatment. *See* Doc. #15 at 00:13:00 through 00:13:30.

Kuiper was consulted, and he ordered that Pinkston be given a shot of Haldol and a shot of Benadryl in separate syringes. *See* Doc. #65-2 at 262–63; Doc. #65-4 at ¶ 6. Pinkston refused the shot and refused restraints. *See* Doc. #1 at 7; Doc. #13 at 3. He was subdued, and the shots were given at approximately 11:50 a.m. Doc. #65-2 at 262–63. Pinkston was reported as calm and awake by 12:46 p.m. *Id*. at 263. He complained of a headache at approximately 5:55 p.m., and Tylenol was administered. *Id*. at 263. At 11:00 p.m., a nurse's note reported that Pinkston was quiet and calm and denied a headache. *Id*. In medical notes recorded up to the incident of forcible administration of medication, Pinkston's behavior vacillated. Sometimes he was cooperative (though manipulative), while he was oppositional, demanding, and hostile at other times.[13]

---

[13] *See* Doc. #65-2 at 28 (noting Pinkston was "loud, disruptive and hard to redirect"), 53 (noting hostile, defensive personality), 66–68 (noting hostile, defensive personality), 73 (noting narcissist demands), 75 (noting hostile, defensive, loud, and negative behavior), 79 (noting hostile, defensive, negative personality), 100 (noting oppositional behavior), 104 (Pinkston stating desire to "hit everyone in the room"), 105 (Pinkston pretended to lose medication),

On September 22, 2016, Pinkston filed a grievance complaining about the medications for his skin treatment, his diet, and the forcible administration of Haldol. *See* Doc. #65-5 at 3. He filed another similar grievance on October 2, 2016, identifying the "exact culprits" of the Haldol shot as various mental health and medical personnel. *Id.* at 7. In reply to his grievances, Pinkston was informed that he had been given the medications ordered for him. *Id.* at 9, 14.

Pinkston claims that as a result of the Haldol shot, he experiences:

> dizziness, agitation, abdominal pain, hypertension, memory loss, nausea, prolonged bouts of diarrhea, weight gain, vomiting, insomnia, motor restlessness, and a year later is suffering abnormal behavior, an eating disorder, overactive bladder, continuous throbbing within the temples causing frequent temporary loss of sight, frequent chest pains, and neuromuscular deterioration that has compromised his safety and ability to live and work in a general population housing unit[.]

Doc. #13 at 2.

It appears Pinkston remained at the MSP hospital until at least October 6, 2016. *See, e.g.,* Doc. #96-4 at 274 (noting infirmary progress note). Pinkston filed the instant lawsuit on or about March 24, 2017. Doc. #1. Pinkston's submitted medical records extend through September 2017, and they demonstrate that Pinkston continued to receive treatment from medical staff the entire time he was housed at MSP. Doc. #65-2 at 8–266; *see also* Doc. #96-4; Doc. #96-5; Doc. #96-6. On January 24, 2018, Pinkston was transferred to the Wilkinson County Correctional Facility, where he is currently housed. *See* Doc. #93.

## VI
## Motion for Injunctive Relief

Pinkston has moved the Court for a temporary restraining order and a preliminary

---

148–49 (Pinkston believed to be faking hunger strike), 153 (manipulative behavior noted), 162 (Pinkston described as verbally combative), 163 (Pinkston exhibiting loud disruptive behaviors but responsive to staff redirection), 189 (Pinkston using profanity at staff, demanding special privileges, and being manipulative), 228 (Pinkston kicking and beating on door), 255 (manipulative behavior noted), 257 (manipulative behavior noted), 261 (Pinkston beating and kicking on door).

injection to receive medical treatment at the Wilkinson County Correctional Facility. Doc. #100.

> Federal court procedural rules distinguish preliminary injunctions from temporary restraining orders. Issuance of an injunction may occur only after notice to the parties, while a temporary restraining order may be issued *ex parte* and without notice. Only the temporary restraining order requires verification in the motion of the immediate need for the order, the efforts that had been taken to contact the adverse party, and a time limit for the order—14 days.

*Knoles v. Wells Fargo Bank, N.A.*, 513 F. App'x 414, 415 (5th Cir. 2013) (citations omitted). Both motions require a showing of likelihood of success on the merits. *See Trottie v. Livingston*, 766 F.3d 450, 453 (5th Cir. 2014) (plaintiff not entitled to preliminary injunction or temporary restraining order when failed to show likelihood of success).

As explained more fully below, the records in this action make it apparent that Pinkston has received continuing, adequate medical treatment, and that his constitutional right to medical care has not been violated. Pinkston, therefore, cannot demonstrate a likelihood of success as to his claim in this action. Accordingly, his motion for Court intervention regarding his medical treatment will be denied.

## VII
## Analysis

Pinkston asserts claims based on his alleged inadequate medical treatment and, relatedly, for the forcible administration of medication.

### A. MDOC

As an initial matter, though not raised by a party, this Court must address MDOC's entitlement to sovereign immunity in this action. *See Perez v. Region 20 Ed. Serv. Ctr.*, 307 F.3d 318, 333 n. 8 (5th Cir. 2002) ("[W]e may consider [state sovereign immunity] … *sua sponte* because it bears on this court's subject-matter jurisdiction.").

"State sovereign immunity is a fundamental aspect of the sovereignty that the states

enjoyed before the ratification of the Constitution and the Eleventh Amendment, and it was preserved intact by the Constitution." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005). As a result of this immunity, "[f]ederal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 393–94 (5th Cir. 2015). A third exception established in *Ex parte Young*, 209 U.S. 123 (1908), allows a plaintiff to bring "suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013).

Courts have consistently held that MDOC is an arm of the state and therefore also protected by sovereign immunity. *See Fields v. Fisher*, No. 1:15–cv–241, 2017 WL 1015011, at *2 (S.D. Miss. Mar. 15, 2017) ("It is well established that [MDOC] is an arm of the State of Mississippi and cloaked with the State's Eleventh Amendment immunity from suit.") (collecting cases). Accordingly, the claims against MDOC must be dismissed unless the state has waived its sovereign immunity, Congress has clearly abrogated it, or such claims fall under the *Ex parte Young* exception. *Paxton*, 804 F.3d at 393–94.

While the state of Mississippi has waived some aspects of its sovereign immunity in the Mississippi Tort Claims Act, that law specifically provides that "[n]othing contained in this chapter shall be construed to waive the immunity of the state from suit in federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." Miss. Code Ann. § 11–46–5(4). And, "§ 1983 does not abrogate state sovereign immunity." *Paxton*, 804 F.3d at 394. Finally, the *Ex parte Young* exception is clearly inapplicable because MDOC is not an individual. *See Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 n.2 (5th Cir. 2016) ("Chhim did not sue individual

state official defendants in their official capacities in this suit; therefore, the *Ex parte Young* exception does not apply to defeat Texas's sovereign immunity from suit."). Accordingly, MDOC must be dismissed for lack of jurisdiction.

## B. Centurion LLC

Centurion argues it is entitled to summary judgment because there is no evidence that it maintained a pattern or practice which led to the alleged constitutional violations at issue.

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[14] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). The Fifth Circuit has held that official policy may be:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). In order for a policy to support liability under § 1983, the policy must have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (quotation marks omitted).

---

[14] Although Centurion is a private corporation, there can be no serious dispute it is properly sued under § 1983 for its role in prison management. *See Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) ("We agree with the Sixth Circuit and with those district courts that have found that private prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury.").

As explained below, there was no constitutional violation based on inadequate medical treatment.  Accordingly, the claim against Centurion must fail in this regard.  Furthermore, Pinkston has cited no evidence which may be construed as a policy of Centurion which has any connection to the alleged constitutional deprivation of forcible medication.  In the absence of such evidence, Centurion is entitled to summary judgment on the claims against it.

### C.  Inadequate Medical Treatment

Prisoners are entitled to receive adequate medical care. A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an unnecessary and wanton infliction of pain. A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. …

[T]here is both an objective and subjective standard. A prison official acts with deliberate indifference only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it. Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that results in substantial harm.

*Rogers v. Boatright*, 709 F.3d 403, 409–10 (5th Cir. 2013) (quotation marks, alterations, emphasis, and citations omitted).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain … whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care."  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (internal quotations, citations, and footnotes omitted).

In his complaint, as amended, Pinkston claims he suffers from eczema and psoriasis.  These conditions, he contends, cause him to have large boils and sores that require him to be treated with

particular lotions and ointments. He maintains that these lotions are "nonformulary" at MSP, and that the medication he receives is insufficient to treat his conditions. As a result, Pinkston claims his skin has continually worsened and remains untreated.

There is no dispute that Pinkston suffers from dry skin—sometimes severely dry skin. There is no evidence in Pinkston's medical records that he suffers from boils. *See, e.g.,* Doc. #65-2; Doc. #65-3; Doc. #96-2; Doc. #96-3; Doc. #96-4; Doc. #96-5; Doc. #96-6. The extensive medical records provided to the Court also demonstrate, however, that Pinkston received regular, ongoing medical treatment for his skin and scalp conditions while he was housed at MSP.[15] Furthermore, Kuiper has submitted a declaration that both A&D ointment and Sebex shampoo are "medically appropriate treatments for [Pinkston's] conditions." Doc. #65-4 at ¶ 5.

Pinkston argues that the medically prescribed treatment was ineffective and that his medical records show his skin conditions have continually deteriorated. However, there are several instances in the submitted records evidencing that Pinkston's skin conditions were not continually worsening. *See, e.g.,* Doc. #65-2 at 252–53 (upon discharge from infirmary skin noted in good condition without rash or ulcers); Doc. #96-3 at 462–64 (no sores noted to skin upon initial assessment); Doc. #96-5 at 61 (though flakes noted on skin, Pinkston stated he did not have on any lotion). Rather, the uncontroverted summary judgment evidence demonstrates merely that Pinkston has a chronic skin condition and was unhappy with the prescribed treatment options. Indeed, Pinkston would sometimes refuse the prescribed medications, thereby presumably worsening his conditions. *See, e.g.,* Doc. #65-2 at 62, 86, 114, 243; Doc. #96-4 at 324.

---

[15] *See, e.g.,* Doc. #65-2 at 26–27 (ointment ordered), 61 (ointment ordered), 113 (ointment ordered), 149 (ointment ordered), 174 (hydrocortisone cream and ointment applied), 209 (Sebex shampoo prescribed); Doc. #96-4 at 285 (ointments ordered), 309 (ointment and scalp solution ordered), 320 (ointment ordered), 330–31 (lotion and steroid cream ordered); Doc. #96-5 at 40 (skin punch biopsy on leg ordered), 60–61 (ointment and therapeutic shampoo ordered), at 65–66, 102 (skin biopsy performed and medications reordered).

In sum, the evidence before this Court demonstrates that Pinkston's dry skin conditions were regularly treated, both before the incident of forcible medication and afterwards, and that he is merely unhappy with the treatment provided. While Pinkston's verified complaint alleges that he suffered from boils and that Kuiper and Barron ignored his initial complaints in this regard, the medical records, which contain no record of boils, show that Pinkston was given treatment for his skin later that day in the form of Benadryl. There is no indication this delay amounted to deliberate indifference. In the absence of such evidence, all defendants are entitled to summary judgment on Pinkston's claim that his constitutional rights were violated by the denial of adequate medical care.

### D. Forcible Administration of Medication

Pinkston was forcibly medicated on September 14, 2016. Pinkston alleges that at the time he was forcibly medicated, he had no diagnosed psychiatric condition, he was not a danger to himself or others, he was not afforded due process protections in a non-emergency situation, and that the shots left him with multiple side effects, including a worsening of his skin condition.

The defendants argue Pinkston's claims regarding forcible administration fail as a matter of law, as Kuiper determined that it was medically appropriate and necessary that Pinkston be administered shots. *See, e.g.,* Doc. #65-4 at ¶ 6. They note that Pinkston voiced no complaints to medical staff of any side effects of the shots before filing this lawsuit. They further argue that Pinkston has failed to exhaust his administrative remedies against Barron, and that Centurion cannot be held liable under a theory of vicarious liability. The MDOC Defendants asserted a lack of exhaustion in their answers and, as explained above, joined the motion for summary judgment.

### 1. Exhaustion

The defendants argue that Pinkston has failed to exhaust his claims against Barron and the MDOC Defendants. In response, Pinkston argues that he was only required to exhaust the

"incident," and not each individual grievance.  *See* Doc. #96 at 12–13.

Because Pinkston was incarcerated when he filed this case, the PLRA applies to this action.

*See* 28 U.S.C. § 1915.  The PLRA provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  It "applies to all inmate suits about prison life"[16] and must be adhered to "irrespective of the forms of relief sought and offered through administrative avenues."[17]  The Fifth Circuit has held that "[d]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint."  *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

The PLRA does not require a particular level of specificity in a prisoner's administrative grievances.  *Johnson v. Johnson*, 385 F.3d 503, 516–19 (5th Cir. 2004).   It requires only that the prisoner give officials a sufficient amount of information to provide them with "fair notice" of the problem.  *Id*. at 516.  Beyond this basic level of compliance mandated by the statute, inmates are required to comply with the grievance procedures of the facility at issue.  *Jones v. Bock*, 549 U.S. 199, 218–19 (2007) (noting "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion").

MDOC has a specific two-step grievance procedure.  *See* Doc. #65-6.  The portion relevant here is that MDOC's procedures require an inmate to present facts "to answer all the questions who, what, when, where, and how concerning the incident" when presenting a grievance to prison

---

[16] *Nussle*, 524 U.S. at 532.

[17] *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).

officials. *Id.* at 1. Therefore, MDOC's procedures prescribe a certain content, and Pinkston's argument that "incident" pleading is sufficient is not well taken. *See Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003), *overruled by implication on other grounds by Bock*, 549 U.S. at 216 (Fifth Circuit takes "a strict approach" to PLRA's exhaustion requirement); *see also Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002) ("notice-pleading" sufficient where administrative rules are silent as to contents and requirements of filing grievance).

In an October 2, 2016, grievance, Pinkston claimed that "the Medical Administrators are unlawfully[,] knowingly[,] feloniously[,] intelligently[,] slyly[,] forcibly administering shots of Haldol and Benadryl to me even though [I] am not psychologically disturbed." Doc. #65-5 at 7. He lists the "exact culprits" as "H.S.A. Ms. Knight, Medical Director Dr. Kuiper, Psychiatrist Dr. Williams, Psychologist Dr. Leflore, Nurse Practitioner Waltz, and Director of Nurses Vicki Thomas." *Id.* The only defendant in this action named in the grievance is Kuiper. Therefore, because MDOC requires content-specific grievances, the October 2016 grievance did not adhere to the standards required to exhaust under MDOC standards regarding Barron, Taylor, Anderson, Hall, and Benford. Accordingly, Barron,[18] Taylor, Anderson, Hall, and Benford are entitled to dismissal for Pinkston's failure to exhaust his claim against them that he was forcibly medicated.

### 2. Violation of rights

In his motion for summary judgment, Kuiper argues that he cannot be liable for the forcible administration of the medication because such administration was in Pinkston's best interest and necessary for his safety.

Prisoners have "a significant liberty interest in avoiding the unwanted administration of

---

[18] The Court has already rejected Pinkston's claim for the denial of medical care but it otherwise notes that Pinkston failed to exhaust his administrative remedies with regard to Nurse Barron as to any claim that his alleged boils were not treated.

antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper,* 494 U.S. 210, 221–22 (1990). While "*Harper* only involved antipsychotic drugs, and the Supreme Court did not expressly address whether its holding applies to other categories of drugs," *Spaulding v. Poitier*, 548 F. App'x 587, 590–91 (11th Cir. 2013), courts have recognized a liberty interest in avoiding unwanted administration of other drugs. *See Roper v. Grayson*, 81 F.3d 124, 125–26 (10th Cir. 1996) (recognizing liberty interest in rejecting treatment with insulin, but concluding interest outweighed). However, it stands to reason that a "plaintiff's liberty interest in not being involuntarily medicated is surely not as strong when relatively innocuous, non-psychotropic medications are being forcibly administered." *Lombardo v. Stone*, No. 99-civ-4603, 2001 WL 940559, at *10 n.14 (S.D.N.Y. Aug. 20, 2001).

Courts analyzing claims of forcible administration must determine whether substantive and procedural due process is satisfied—that is, "what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will" (the substantive component), and "whether the State's … mechanisms used to determine the facts in a particular case are sufficient" (the procedural component). *Harper*, 494 U.S. at 220.

### a. Substantive due process

The Supreme Court has held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id*. at 227. For drugs other than antipsychotics, the Government need only show that its "interest in protecting Plaintiff and their constitutional duty to provide him with adequate medical care outweighed his interested to reject the medical treatment." *Roper*, 81 F.3d at 125.

The competent summary judgment evidence before the Court demonstrates that in the hours before Pinkston was forcibly medicated, he was disruptive and threatening. The evidence also demonstrates, however, that Pinkston had not been treated with any psychotropic medication while he was housed at MSP, that his only psychiatric diagnosis was a personality disorder, and that he was locked in a cell at the time he was yelling at staff and kicking doors. There is little in the record concerning Kuiper's interaction with Pinkston on the day he was forcibly medicated. While Kuiper has submitted a declaration stating that Pinkston was appropriately treated with forcible medication based on his "risk of harm to self and others," there is no factual circumstance laid out for the Court to illuminate what, beyond general disruptiveness, that was. *See* Doc. #65-4 at ¶ 6. Under these circumstances, the Court cannot conclude that Pinkston was a danger to himself or others so as to justify administration of the antipsychotic Haldol, or that Benadryl was necessary to protect Pinkston and provide him adequate medical care so as to justify administration of the Benadryl. Accordingly, Kuiper's request for summary judgment on Pinkston's substantive due process claim must be denied.

### b. *Procedural due process*

Procedural due process is satisfied if: (1) a doctor evaluated the inmate and recommended drug treatment; (2) a hearing was held before an independent group of doctors and administrators; and (3) the inmate received prior notice of the hearing. *Id*. at 215–16, 225. While it stands to reason that the lesser intrusion of non-antipsychotic drugs would require lesser protections, there can be no serious dispute that the interest is entitled to *some* procedural protection. *See Gibson v. Tex. Dep't of Ins. – Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) ("At a minimum, due process requires that notice and an opportunity to be heard be granted at a meaningful time and in a meaningful manner.") (quotation marks omitted). However, notwithstanding these

procedural protections, "the state retains the authority to administer … a drug in an emergency situation …." *Hogan v. Carter*, 85 F.3d 1113, 1117 (4th Cir. 1996). Notably, and of relevance here, an inmate being "loud and uncooperative" is not an emergency situation so as to abrogate the need for procedural protections. *Kulas v. Valdez*, 159 F.3d 453, 456 (9th Cir. 1998).

In this case, there are disputed material facts as to whether the circumstances were sufficient to warrant a forcible administration of medication, and whether a sufficient emergency existed to forego any procedural protections. Accordingly, summary judgment is denied to Kuiper as to this claim.

## VIII
## Conclusion

For the reasons above:

1. Pinkston's motion for reconsideration [110] is **DENIED**.

2. Pinkston's motion for injunctive relief [100] is **DENIED**.

3. Pinkston's motions for sanctions [107][108] are **DENIED**.

4. The Centurion Defendants' motion for summary judgment [65], joined by the MDOC Defendants [67], is **GRANTED in Part and DENIED in Part**. The motion is DENIED to the extent it seeks summary judgment on the forcible medication claim asserted against Kuiper. The motion is also DENIED to the extent it seeks summary judgment against MDOC, who is sua sponte **DISMISSED** for lack of jurisdiction. The motion is GRANTED in all other respects.[19]

**SO ORDERED**, this 25th day of July, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[19] As noted above, the Clerk of the Court is directed to remove Document #104's motion designation.