IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

CHAZ PINKSTON                                                                                    PLAINTIFF

V.                                                                                    NO. 4:17CV39-DMB-DAS

DR. KUIPER                                                                                       DEFENDANT

REPORT AND RECOMMENDATION

An evidentiary hearing was held in this action on May 23, 2019, to resolve whether Plaintiff, Chaz Pinkston, was involuntarily medicated in violation of his constitutional rights on September 14, 2016, at the Mississippi State Penitentiary ("MSP"). Pinkston, an inmate currently housed at Wilkinson County Correctional Facility ("WCCF") and proceeding pro se in this action, refused to attend the hearing. The Defendant, represented by counsel, appeared and gave testimony. Defendant also entered two exhibits into evidence. Having heard the testimony and reviewed the evidence, the undersigned makes recommendations that follow.

I.
Evidence from the Hearing

Janette Grayson, WCCF Transportation Sergeant, testified telephonically that she arrived at WCCF at approximately 4:00 a.m. on May 23, 2019, to transport Pinkston from WCCF in Woodville, Mississippi, to his 10:00 a.m. hearing in Oxford, Mississippi. Grayson testified that because Pinkston was a high-risk offender, his transport required the assistance of four officers and a second vehicle following the prisoner transport vehicle. She stated that while she was preparing for transport, two other officers involved in Pinkston's transport went to retrieve him, returning to report to her that Pinkston was refusing to leave his cell. Grayson testified that at

1

around 4:15 a.m., she went to talk to Pinkston, who was refusing to leave his cell unless he was given a haircut. She stated that she tried to convince Pinkston to get into the transport van to attend his court date, advising him that the facility was on lockdown and that there was no possibility that he could receive a haircut. Grayson testified that despite her repeated attempts to coax Pinkston out of his cell, Pinkston remained steadfast in his refusal to attend his evidentiary hearing.

Defendant also admitted the videotaped deposition testimony of former MSP nurse, Leatha Ann Barron, into evidence. Def. Ex. 1.[1] In her deposition testimony, Nurse Barron stated that Pinkston was transported to MSP and admitted to the facility's psychiatric unit on or about July 18, 2016, after going on an alleged hunger strike at WCCF. She testified that Pinkston had been diagnosed with Narcissistic Personality Disorder, and in the weeks leading up to the forcible-medication incident on September 14, 2016, Pinkston had displayed angry, combative behavior at staff. *Id*. During this same time frame, Pinkston also engaged in self-destructive behavior, such as discarding his medications and refusing food. *Id*. Nurse Barron stated that when she arrived on the psychiatric ward at 8:00 a.m. on September 14, 2016, Pinkston was observed "yelling, imitating animal sounds, and kicking on door." *Id*.; MDOC 1193. When she returned at 11:20 a.m., she noted that Pinkston was "disruptive, oppositional, and threatening," even asking an officer to open the cell door so that he could "knock [her] out." *Id*. She stated that Pinkston also threatened to kill her and threatened to flood his cell. *Id*.

Nurse Barron maintained that she was frightened by Pinkston, and that his flood threat, if carried out, would have required extra security personnel to relocate other inmates in psychiatric care. *Id*. Nurse Barron stated that Pinkston's conduct also caused the other inmates to become anxious and "act[] out" by yelling and kicking on their walls and doors, behavior that often

---

[1] Defendant's "Ex. 1" is a compact disc composite exhibit of Nurse Barron's testimony and Pinkston's medical records.

required the assistance of extra security personnel to control. *Id*. Nurse Barron claimed that Pinkston's conduct also drew the attention of Dr. Kuiper, who could hear the disruption while in his office. *Id*. After officers' attempts to calm Pinkston failed, Dr. Kuiper visited Pinkston's cell and advised him that he would be medicated if he did not calm down. *Id*. After Pinkston refused (or was unable) to cease his disruptive behavior, Dr. Kuiper ordered Pinkston to be medicated with Haldol and Benadryl. *Id*.

Dr. Hendrick Kuiper, a licensed physician who practiced from 1969 through 2017, testified that he served as a physician and Medical Director at MSP for about a year between 2016 and 2017. He stated that although Pinkston's day-to-day care was carried out by the psychiatrist and a nurse practitioner, he was peripherally involved with Pinkston's care by virtue of his role at the hospital. Dr. Kuiper testified that Pinkston arrived at MSP for psychiatric treatment and evaluation after malingering a hunger strike. According to Dr. Kuiper, Pinkston's medical records indicated that he suffered with Narcissistic Personality Disorder, Antisocial Personality Disorder, had a history of schizophrenia, episodes of paranoia, and had manifested symptoms of Bipolar Disorder. Dr. Kuiper maintained that Pinkston's intermittent starving of himself was consistent with his diagnosis of Narcissistic Personality Disorder, as individuals with such a disorder are self-absorbed and react with anger and manipulation when they perceive they have been slighted in some way. Dr. Kuiper agreed that nurse's notes in Pinkston's medical records memorializing episodes of combative, disrespectful, and manipulative behavior by Pinkston, were consistent with his own recollection of Pinkston's conduct.

Dr. Kuiper testified that on September 14, 2016, he was in his office a floor below the hospital unit, when he heard Pinkston causing a disruption above. Dr. Kuiper stated that he went to speak to Pinkston and convince him to calm down, but Pinkston was so angry that he was unable to calm himself. Dr. Kuiper stated that individuals who become that enraged are self-destructive,

3

and Pinkston was a threat to himself and others at that point. He also noted that Pinkston was housed on a unit with individuals with fragile psyches, such as persons with dementia, paranoid schizophrenia, and those on suicide watch. *See* Def. Ex. 2. Dr. Kuiper testified that Pinkston's behavior was "stirring up" the other inmates to act out, and the situation was becoming more dangerous the longer it lasted. He also noted that Pinkston's threat to flood his cell could have led to an evacuation if other offenders joined in to attempt to flood their cells, which would have caused a security risk. Dr. Kuiper stated that Pinkston's conduct created an emergency, and medical intervention was absolutely necessary.

Dr. Kuiper noted that at the time the Haldol and Benadryl was ordered to be administered to Pinkston, Pinkston's behavior had gone on for hours. Dr. Kuiper testified that Haldol is an antipsychotic with a calming effect, while Benadryl is an antihistamine with a sedative effect. He noted that Pinkston's medical records indicate that the medications were administered at 11:50 a.m., and that Pinkston was not observed as "calm" until 12:46 p.m. Dr. Kuiper testified that as Haldol works "within minutes," the fact that it took longer than 30 minutes for Pinkston to calm down shows that he was particularly agitated at the time the medication was administered. Dr. Kuiper confirmed that Pinkston's medical records indicate that he reported a headache at around 4:35 p.m. on September 14, 2016, but Tylenol was prescribed, and he denied a headache by 11:00 p.m. that evening. Def. Ex. 1, MDOC 1194.

Dr. Kuiper testified that he determined Pinkston's behavior created an emergency threatening the imminent likelihood of harm to himself or others and/or property destruction, and that treatment was in Pinkston's best interests. Therefore, he claimed, the incident of forcible medication on September 14, 2016, was both medically appropriate and in complete compliance with Mississippi Department of Corrections' policy regarding the forcible administration of medication.

4

## II.
## Applicable Law

Prisoners have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper,* 494 U.S. 210, 221-22 (1990). The right has both a substantive and procedural component: that is, "what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will" (the substantive component), and "whether the State's ... mechanisms used to determine the facts in a particular case are sufficient" (the procedural component). *Harper*, 494 U.S. at 220-21.

However, the Supreme Court has held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. This emergency exception exists because requiring the State to jump through procedural hoops in the face of an emergency would jeopardize the well being of the inmates "for whose protection the State is constitutionally responsible." *Hogan v. Carter*, 85 F.3d 1113, 1117 (4th Cir. 1996).

## III.
## Discussion

Plaintiff Chaz Pinkston voluntarily absented himself the evidentiary hearing in his § 1983 action because prison staff would not meet his demands for a haircut. Therefore, this case should be dismissed for his failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).

Moreover, as the party claiming a constitutional violation pursuant to § 1983, Pinkston bears the burden of proof. *See, e.g., Gomez v. Toledo*, 446 U.S. 635, 640 (1980). He has failed to sustain that burden.

First, it is not disputed that Pinkston suffers Narcissistic Personality Disorder. Narcissistic Personality Disorder is characterized by the psychiatric community as a mental illness. *See Diagnostic and Statistical Manual of Mental Disorders* at 645 (5th ed., 2013). According to the Mayo Clinic, a patient suffering from Narcissistic Personality Disorder may "[h]ave difficulty regulating emotions and behavior" and may "[r]eact with rage or contempt" toward others. *See* Narcissistic Personality Disorder at https://www.mayoclinic.org/diseases-conditions/narcissistic-personality-disorder/symptoms-causes/syc-20366662 (last accessed May 23, 2019). The undisputed testimony in this cause is that Pinkston was, in fact, having difficulty regulating his behavior on September 14, 2016, and did, on that day, act out physically and verbally toward staff in a threatening, dangerous manner.

Second, the Court finds Dr. Kuiper's testimony that medical intervention was necessary and in Pinkston's best interests both credible and reasonable. The Court notes that Dr. Kuiper had significant medical discretion to determine whether and how medication should be administered, given his duty to protect the health and safety of all the inmates in the prison. *See Washington*, 494 U.S. at 231 (noting "an inmate's interests are adequately protected. . . by allowing the decision to medicate to be made by medical professionals rather than a judge"). After hearing the evidence in this matter, the undersigned expressly finds that Dr. Kuiper evaluated Pinkston and determined that the forcible administration of medication was medically appropriate and was in Pinkston's best interests at the time, and that it was necessary to avert a potential crisis with the other inmates and staff. It would be unreasonable to conclude that Dr. Kuiper should have waited until Pinkston harmed himself or created a more dangerous environment for other inmates in fragile mental conditions prior to forcibly medicating Pinkston, and the circumstances presented to Dr. Kuiper were sufficient to forego further procedural protections.

## IV.
## Conclusion

For the reasons set forth herein, it is **RECOMMENDED** that judgment be entered in this case for Dr. Kuiper, and that he be dismissed from this action with prejudice.

## V.
## Handling of Objections, Acknowledgment of Receipt

The appropriate procedures for filing objections to these findings and recommendations are found in 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). Objections must be in writing and must be filed within fourteen (14) days of this date, and "a party's failure to file written objections to the findings, conclusions, and recommendations in a magistrate judge's report and recommendation within [14] days after being served with a copy shall bar that party, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. . . .". *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc) (citations omitted); *see also United States v. Carrillo-Morales*, 27 F.3d 1054, 1061-62 (5th Cir. 1994), *cert. denied*, 513 U.S. 1178 (1995).

The plaintiff must acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the clerk of the court within fourteen (14) days of this date. Failure to comply with the requirements of this paragraph may lead to dismissal of this lawsuit under Fed. R. Civ. P. 41(b) for failure to prosecute the claim and for failure to comply with an order of the court.

Respectfully submitted, this, the 6th day of May, 2019.

/s/ David A. Sanders
UNITED STATES MAGISTRATE JUDGE