## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**CHAZ PINKSTON**                                                              **PLAINTIFF**

**V.**                                                      **NO. 4:17-CV-39-DMB-DAS**

**MISSISSIPPI DEPARTMENT OF**
**CORRECTIONS, et al.**                                             **DEFENDANTS**

### ORDER

After a long and winding procedural history in this case, this Court held a four-day evidentiary hearing[1] on Chaz Pinkston's only remaining claim—a due process forcible medication claim against Dr. Hendrick Kuiper. Because Pinkston was not a danger to himself, others, or property at the time Kuiper directed that Pinkston be forcibly injected with medication, the Court finds Kuiper violated Pinkston's due process rights. However, because Pinkston has not established a causal connection between the injections and the injuries he alleges, he is entitled to only nominal damages.

### I
### Standard

When a prisoner bringing a claim under the Prison Litigation Reform Act does not demand a jury trial, a court may hold "an expanded evidentiary hearing," also known as a *Flowers*[2] hearing. *Clark v. Richards*, 26 F.3d 1118, 1994 WL 286159, at *6 (5th Cir. 1994) (unpublished table decision). "A *Flowers* hearing amounts to a bench trial replete with credibility determinations and findings of fact." *Ashford v. United States*, 511 F.3d 501, 504 (5th Cir. 2007) (internal quotation

---

[1] The hearing took place over a span of four days: October 15, 2020; October 20, 2020; November 4, 2020; and November 18, 2020. *See* Docs. #289, #295, #306, #321.

[2] *Flowers v. Phelps*, 956 F.2d 488 (5th Cir. 1992).

marks omitted). Due process claims, like the one at issue here, are evaluated under a preponderance of the evidence standard. *Colon v. Schneider*, 899 F.2d 660, 672 (7th Cir. 1990); *Mitchell v. Cooper*, 228 F. Supp. 3d 343, 347 (D. Del. 2017). "Preponderance means that [a fact] is more likely than not." *United States v. Mitchell*, 709 F.3d 436, 442 n. 14 (5th Cir. 2013).

## II
## Hearing Evidence

At the hearing, Pinkston testified on his own behalf and called as witnesses Kuiper, Shaira Thames, Julia Pinkston, Chantriss Pinkston, and Christopher Roy. Doc. #332. Kuiper testified on his own behalf as well. *Id.* Both Pinkston and Kuiper introduced deposition excerpts of Leatha Ann Barron. *Id.* They both also submitted documentary evidence.

### A. Kuiper's Testimony in Pinkston's Case-in-Chief

When called by Pinkston, Kuiper testified:

He became the Medical Director at the Mississippi State Penitentiary ("MSP") hospital in July of 2016. In that role, he was responsible for the health of all MSP patients and for knowing all relevant institutional policies, including those pertaining to the forcible administration of medication. Daily medical care was left to the treating psychiatrist and nurses.

Pinkston was transferred to MSP because he had begun a hunger strike at another facility. At the time Pinkston was transferred, he had been diagnosed with Narcissistic Personality Disorder. Pinkston was not undergoing any "treatment" for such disorder and had a history of being combative and argumentative with the staff.

On September 14, 2016, he was working in his office directly below the patients' cells. While in his office, he heard a disturbance above, went upstairs to see what was going on and, when he arrived, observed Pinkston using foul language and threatening nurses, saying, "I should kill you." He advised Pinkston to "settle down" multiple times but Pinkston did not. Pinkston

2

was "completely out of control," emotionally and physically.  Pinkston's outburst had stirred up the other inmates and they quickly became loud and disruptive as well.

He ordered Leatha Ann Barron, a nurse on duty, to give Pinkston injections of Haldol, an antipsychotic drug, and Benadryl.  Haldol was safe and low-risk, with minimal side-effects and a short lifespan.  He believed Haldol was the appropriate medicine for the situation.  Three MSP employees entered Pinkston's cell to administer the shots and it took hours for Pinkston's behavior to calm.  Pinkston did not assault or otherwise harm the employees who entered his cell, and the shots were administered without incident.

He prescribed the medications because Pinkston's behavior posed a danger to himself and others and because Pinkston had a history of harming himself when he did not get what he wanted. While Pinkston was locked in his cell at the time of the disruption, he believed Pinkston's behavior could cause harm by further instigating his fellow inmates and possibly flooding his cell.

He believes that, generally, patients have the right to refuse antipsychotic medications but argued that this was a "psychotic situation" and that he needed to take the necessary steps to get the situation under control.

**B.  Shaira Thames' Testimony**

Pinkston's sister Shaira Thames testified:

Pinkston never assaulted anyone or caused any property damage while incarcerated, nor used threatening or foul language towards any prison staff.  She believed Pinkston was a person who was in control of his actions and had never harmed himself.

Pinkston told her about participating in hunger strikes but explained those strikes were a way for him to get prison administration's attention and have his concerns addressed.  He also told her of physical abuse he suffered at the hands of prison guards throughout his incarceration.

3

Benadryl has caused Pinkston to suffer adverse reactions in the past, causing his skin condition to worsen, sometimes with increased itching, bleeding and boils.

Prior to the injections, Pinkston was in good mental and emotional health; he was a very analytical and detail-oriented person. After the forced medication, however, Pinkston exhibited unusual emotional behavior and seemed depressed. During their conversations, Pinkston no longer paid much attention to detail, his speech patterns were scattered, and he appeared to have instances of memory loss (both short-term and long-term). She believes there was a "marked change" from who Pinkston had been before the shots to who he was now.

### C. Julia Pinkston's Testimony

Julia Pinkston, Pinkston's mother, testified:

Pinkston had good character and had no history of mental health issues.

She had spoken with prison staff throughout Pinkston's incarceration and no one reported any behavioral problems. The only reports she received as to Pinkston's behavior were that he talked a lot and asked lots of questions. She spoke on the phone with Pinkston regularly and there was always very loud background noise.

Pinkston had no history of violent behavior before his incarceration and never used foul language. He had never harmed nor attempted to harm staff or himself.

Pinkston would get upset on occasion but always exhibited self-control. Pinkston told her of one incident in which other inmates stole items from his cell and when Pinkston confronted them, a physical altercation ensued.

She was aware of Pinkston's hunger strikes and opposed them but understood their purpose was to bring attention to issues. Pinkston told her of terrible conditions at the prisons, and these strikes were meant to address them.

Pinkston suffered from skin issues, specifically eczema, since childhood but they were originally only "small-scale." Since incarceration, however, the condition had worsened. Pinkston had shown her his leg when she visited once and it looked very bad.

Before the injections, Pinkston displayed normal emotional and mental health in that he dealt with everyday life as anyone else might. Since the injections, however, Pinkston becomes upset easily, whines, has displayed some instances of erratic behavior, and sometimes appears depressed. Since the shots, Pinkston has complained of short-term memory loss, headaches, and a rapid heartbeat. The incident traumatized Pinkston and he talks about it often.

### D. Chantriss Pinkston's Testimony

Chantriss Pinkston, another sister of Pinkston, testified:

While Pinkston would get irritated at times, he never lost control of his actions. She had never heard him curse or use derogatory language, nor had she ever seen him display violent behavior.

Although he participated in hunger strikes, Pinkston never harmed or attempted to harm prison staff or himself. However, she and Pinkston discussed a physical altercation he had with other inmates in which Pinkston was not the aggressor.

She regularly spoke with prison medical staff before the forced medication event and she received no reports of Pinkston having behavioral problems or mental health issues. When speaking on the phone with Pinkston or prison staff, she often heard loud background noise, with what sounded like people beating on doors and screaming.

Pinkston had very dry skin and his leg had large areas that were "patterned," which appeared "cakey and crusty," and looked very uncomfortable.

Before the injections, Pinkston's thoughts were well-organized, and he made calculated

decisions before acting. After the incident, Pinkston often made incoherent statements, acted irrationally, talked of delusions and hallucinations, discussed emotions more often, and generally was just not himself. He also complained to her of chest pains, heart fluttering, worsened skin, numbness/dizziness, difficulty breathing and trouble sleeping after receiving the medications. Pinkston talks about the injections regularly.

### E. Christopher Roy's Testimony

Christopher Roy, an inmate formerly at MSP, testified:

He met Pinkston sometime in 2017, after Pinkston received the injections. He and Pinkston were housed in the same building at MSP for about a year and became well-acquainted.

Pinkston had an argumentative personality and would often argue and debate with others, but he had never seen Pinkston exhibit violent behavior. He did not recall ever hearing Pinkston use foul language or threaten to harm anyone.

He remembered an incident that involved some shouting when Pinkston "disagreed" with a nurse but Pinkston was loud only to get the nurse's attention. He had witnessed Pinkston get upset with staff and nurses on a number of occasions. Pinkston was consistently upset about food and medical care provided.

He knew of Pinkston's hunger strikes and believes they were a form of "protest" to bring attention to serious issues, like Pinkston's worsening skin condition. He saw Pinkston's legs and the skin was very dry, "cracked" all up and down, and split open to where you could see an infection. Pinkston appeared to be in severe pain and could barely walk. He believes Pinkston's skin condition worsened since receiving the injections but did not know Pinkston before the shots.

### F. Pinkston's Testimony

Pinkston appeared as a witness in support of his own case. He testified:

Prior to the incident in question, medical staff often came in his cell while an officer stood at the door. He had not harmed nor attempted to harm any staff members and he had never flooded his cell nor tried. While he had expressed frustration and anger and occasionally reached out for help, he was merely upset about the conditions of confinement and tired of having multiple altercations with gang members who kept trying to steal his property. His hunger strikes were meant to bring attention to the issues in a non-violent way.

On September 14, 2016, he awoke to find six boils on his inner thigh and groin area. He immediately asked an officer named Harris to get a nurse's attention. Harris returned to his cell with Barron, and he told her about the boils. Barron responded that the boils were "not a real emergency" and to call her when he had a "real emergency."

Sometime later, Kuiper and his assistant came down to the ward. Pinkston tried to get Kuiper to look at the boils but he refused, saying he was there to see a different patient. The assistant came over and looked and saw his boils and dry skin. The assistant then went to Kuiper and advised him of Pinkston's issue but Kuiper shook his head, and the two then proceeded on their way. He asked Harris to contact Willie Knighten, the Heath Services Administrator for MSP. Knighten, however, advised that he would not see Pinkston absent a valid reason.

Following the staff's refusal to help him, he began beating on his cell door and yelling. His fellow inmates also began shouting and beating on their doors, asking the staff to help him. Barron and Harris returned to his cell and Harris advised him to calm down, explaining that he was trying to get Pinkston some medical attention.

A mental health technician, Patricia Robinson, arrived at the ward, and she, Barron, and Harris came to his cell. Robinson asked him what was wrong and he told her about the boils. Barron told Robinson that what he was saying was not true, and that he had exposed his groin area.

Barron then took Harris and Robinson by the hands and/or wrists and led them out of the ward.

He and the inmates again began screaming and beating on their doors. An unidentified Licensed Practical Nurse ("LPN"), accompanied by Harris, approached his cell and told him that Barron and Kuiper had advised the medical staff not to treat him because he was "faking." The LPN, however, slipped him some antibiotic ointment, gauze and bandages under the door but asked that he not tell anyone, as she was not supposed to be helping him.

Barron subsequently returned with Kuiper, who told him, "you the one acting crazy, I got something for you." Pinkston again asked for help but Kuiper responded, "you the one acting up, I got something for you, I got something for you." Someone then stated, while laughing, that "the doctor says you gotta get these shots to make your skin clear up."

Staff members removed him from his cell and someone, presumably Barron, administered three injections into his arm, two Haldol and one Benadryl. He was then placed back in his cell with no restraints. He kicked his door for approximately fifteen seconds before the shots took effect. The medications' immediate side effects were nausea and an upset stomach.

Following the injection, he spent about seven days in bed, getting up only to use the bathroom and he did not eat during that time. He has suffered frequent headaches, trouble sleeping, and increased blood pressure. However, he occasionally dealt with these same issues prior to the forced medication. He suffered throbbing pain in the left side of his head for almost three years, coupled with vision problems, and also had lockjaw for about two years. The shots caused him to become more emotional with many instances of crying, and made it difficult for him to control his thoughts. He experienced significant weight gain within thirty days. Additionally, because he was allergic to Benadryl, the injection exacerbated his skin issues. He complained of these issues to staff but Barron did not allow anyone to document these complaints, other than one instance of a

8

headache immediately following the incident.

The toilet in his cell could only flush twice in an hour's time, and his sink had a timer, allowing use for only five seconds at a time, twenty times an hour. Thus, it was impossible for him to have flooded his cell, even had he tried. There was nothing else in his cell for him to destroy or damage. During the incident at issue, he never threatened anyone and was merely asking for help.

Although he had been prescribed antipsychotics in the past, he had never actually taken them and they were merely prescribed to help him sleep. While some mental health professionals made notes in his mental health records identifying possible mental health issues, he had never been forced to take antipsychotic drugs before and no treatment was ever prescribed other than "talk therapy." Moreover, he was not prescribed nor taking any antipsychotic medications at the time of the incident, nor was he undergoing any other type of mental health treatment.

He believes Barron did not like him and she would write officers up for bringing him extra food during his hunger strikes. She would not enter his cell unless ordered to do by a superior.

He had few interactions with Kuiper before this incident and on those occasions, when he asked Kuiper medical questions, Kuiper advised him to contact his treating psychiatrist "Dr. Williams." Kuiper followed Barron's lead when it came to him, particularly as to this incident.

### G. Kuiper's Testimony in His Own Defense

Kuiper testified again, this time as a witness in his own defense.[3] He testified:

While surgery was his specialty, he had experience treating patients with mental illnesses.

---

[3] The bulk of Kuiper's substantive testimony during direct and re-direct examination was the result of questions by counsel which were undisputedly "leading." The Court views such testimony with skepticism as "[t]he use of leading questions during direct examination of a witness is restricted to instances where it is "necessary" to develop the testimony." *United States v. Dumpson*, 70 F.3d 1268, *1 (5th Cir. 1995) (citing Fed. R. Evid. 611(c)). Under Rule 611(c) of the Federal Rules of Evidence, leading questions are proper only during cross-examination of a "hostile witness, an adverse party, or a witness identified with an adverse party."

As Medical Director, he recalled that Pinkston was transferred to the MSP hospital due to a history of hunger strikes and that Pinkston's medical record reflected a history of mental illness, including bipolar disorder, manic depressive disorder, and antisocial personality disorder, but that these diagnoses were removed prior to being under his care. Thus, Narcissistic Personality Disorder was Pinkston's only mental health diagnosis at the time he was transferred. However, he believed Pinkston suffered from severe mental illness. The diagnosed personality disorder usually did not require treatment with antipsychotic medications.

The ward housed inmates with a variety of mental health issues, some with serious illnesses like schizophrenia, and they required constant observation and treatment. These inmates were seen daily by either medical or mental health professionals or, in some cases, both.

Pinkston was forcibly medicated to protect the inmates, staff, and Pinkston. Both he and other staff members repeatedly asked Pinkston to calm down but to no avail. He believed Pinkston's behavior was out of control, spiraling even further, and it was in everyone's best interest, including Pinkston, that Pinkston be medicated. It is his opinion that ultimately no harm occurred *because* of the medications.

Pinkston had only used verbal threats but threats needed to be taken seriously and he needed to proceed under the assumption that Pinkston would put the threats into action. Threats are often a precursor to violence.

He could not recall any instances of Pinkston engaging in violent behavior prior to the date of the injections. But on the day in question, Pinkston was in a state where he could endanger his own health and welfare to get whatever it was he wanted. Additionally, Pinkston was not adverse to bodily harm as evidenced by his history of hunger strikes.

During his time at MSP, he personally observed Pinkston act in a manipulative manner and

threaten staff.  Pinkston never yelled at nor used profanity towards him, although nurses reported such behavior.

He believes Pinkston is an intelligent man but that his mental health sometimes prevented him from acting in an appropriate manner.  He opined that Pinkston was often manipulative.

 While Pinkston was confined in his cell during the disruption, the situation required staff to open his cell, thereby exposing them to potential harm from Pinkston.  It took many staff members helping in some fashion so that the injections could be administered.

During his time working at MSP, he had observed inmates flooding their cell.  Accordingly, on the day in question, he believed, but did not know, that Pinkston could flood his cell.  An inmate's flooding of his cell posed a security and safety danger because it would require an evacuation of the inmates.

He was concerned because Pinkston's behavior was "stirring up" the other inmates, as they had already started yelling and banging on doors.  This posed an additional danger to staff and the inmates themselves, particularly those with severe mental illness.  He did not forcibly medicate the other inmates because they calmed down once Pinkston's behavior ceased and because it was clear that they were reacting to Pinkston's actions.  However, had the other inmates not calmed down, they too would have been medicated.

He complied with all applicable institutional policies regarding involuntary medication.  He followed the policy's requirements given the nature of the situation presented and his decision was directly in line with what the policy intended.  The policy required notice and a hearing only in a chronic situation, requiring medication on a continuing basis but the policy provided differently when an acute emergency presented itself, such that no involuntary medication hearing is required.

The decision to medicate does not necessarily depend on an inmate's mental health history but is based on the situation presented. In an emergency, there was no requirement that the inmate suffer a mental illness, although Pinkston did have such an illness. Because this was an emergency, he complied with the policy completely.

While he was not Pinkston's treating physician, in his role as Medical Director, his decision superseded that of the other medical personnel. Thus, he did not consult with a psychiatrist prior to ordering the shots because it was an acute situation that required immediate attention. He did, however, discuss the incident with Pinkston's treating psychiatrist the next morning, and the psychiatrist concurred with his decision to medicate.

Haldol is a calming psychotropic drug that he and others had used before when the situation warranted. It is usually effective for about eighteen hours and is typically out of one's system within twenty-four hours. Headaches are a possible side effect of Haldol but they would be short-term, lasting only twenty-four to thirty-six hours.

His order allowed Haldol to be given again after six hours but that became unnecessary because the first dose had its desired effect—to calm Pinkston. He had not prescribed Haldol to Pinkston before this incident because Pinkston's behavior had never been this out of control.

He prescribed Benadryl as a precautionary measure in case Pinkston had an allergic reaction to the Haldol, and also because of its tendency to cause drowsiness. It takes about twenty-four hours for Benadryl to get out of one's system.

Once the drugs had run their course, it is possible to experience drowsiness for an additional twenty-four to thirty-six hours. In his experience, there were not any long-lasting side effects from a single shot of each of the medications. While side effects were possible, the risk of side effects was low compared to the benefit provided.

### H.  Barron's Deposition Testimony

In addition to live witness testimony, the parties submitted excerpts from Leatha Barron's January 30, 2019, deposition, at which Pinkston was not present.  Barron testified:

She worked at the MSP hospital as a staff nurse, with alternating charge nurse responsibilities from March 2015 to December 2017.  She recalled Pinkston as a patient and remembered he had been transferred to MSP because of an alleged hunger strike and that he was placed in MSP's psychiatric ward.  He had previously been diagnosed with Bipolar Disorder and Obsessive-Compulsive Disorder but at the time of the incident, his only current diagnosis was Narcissistic Personality Disorder.  Pinkston was assigned to the psychiatric ward so that staff could monitor his eating habits and start intravenous fluids if it became necessary.  He continued his hunger strike for some time while housed at MSP.

Pinkston's medical records contained no documented behavioral problems but he did have such problems.  When she and others made their rounds, Pinkston "always attempted to control the meetings" by trying to control which staff member entered his cell and, additionally, insisting that his medications be handed to him by guards instead of medical staff.  She believed Pinkston was a disruptive inmate who "didn't have much respect for staff members, especially women."

During Pinkston's hunger strike, staff determined that he was malingering after she noticed food trays hidden under his bed.  When staff confronted him about potential malingering, Pinkston allegedly "became angry and verbally abusive" and accused Barron of not liking him.  Notes in Pinkston's medical records indicated that he had previously made threats, verbally harassed staff, and used profanity.  Pinkston frequently yelled, banged on his cell door, and cursed at staff.  He often refused medical care, believing that this was his way of acting out when he disagreed with MSP management or was upset because he was denied a request.

13

At 8:10 a.m. the morning of September 14, 2016, she made a note which described Pinkston as "yelling, imitating animal sounds, and kicking on the door." Later, at 11:20 a.m. that same day, she entered another note which stated that Pinkston became "disruptive, oppositional, and threating because [she] was rounding." Pinkston asked an officer to open his cell door so that he could "knock [her] out," and his threats to kill her continued. Pinkston threatened to flood his cell and explained that doing so would have led to an evacuation of all inmates on the ward. Pinkston's threats frightened her. She did not believe Pinkston would harm himself but believed his actions caused a threat to prison security.

Pinkston's outburst caused the other inmates to act out, as they began yelling, beating on walls, and kicking on doors. After hearing the disturbance from his office downstairs, Kuiper came up to assess the situation, and spoke with her upon his arrival on the ward. Kuiper tried to calm Pinkston and advised him that if he did not cease his outburst, he would be medicated. Pinkston responded to Kuiper's warning by saying that he did not have to do what Kuiper said. Kuiper subsequently ordered the injections of Haldol and Benadryl, which she believed would have a calming effect. After Kuiper prescribed the medications, security was called to accompany Barron into Pinkston's cell, and she administered the shots. Pinkston's behavior continued for hours and ceased only after he received the injections. She did not attempt to calm Pinkston but noted that others did, without success. She believes Kuiper's decision was medically appropriate. Had Pinkston not received the injections, the disruption would have continued and likely resulted in all inmates on the ward receiving such medications. She did not recall Pinkston complaining of any side effects after the shots were administered.

## I. Documentary Evidence

The parties both submitted documentary evidence, including the Mississippi Department

of Corrections' policy regarding forcible administration of medication. That policy provides:

> Anti-psychotic medications will be administered involuntarily only when due process is followed, except in medically emergent situations. It must be demonstrated that the offender is suffering from a mental disorder and is of unsound mind, as a result of the disorder constituted a likelihood of serious harm to him[self] or others, property destruction, or is gravely disabled. In circumstances where medication is to be administered involuntarily, the Commissioner or designee and the Chief Medical Officer (CMO) will be notified immediately. Notification of the Commissioner and the CMO, along with the request for an involuntary medication hearing will be documented in the offender's health record and the offender's mental health record.

Doc. #334 at 1-2.

The policy further declares that "[a]n emergency will be deemed to exist when, in the judgment of a licensed physician or psychiatrist with prescriptive authority, an inmate is suffering from a mental disorder and as a result of that disorder, presents an imminent likelihood of serious harm to himself or others, property destruction, or is gravely disabled." *Id*. at 1. The policy defines a mental disorder as "[a]ny organic, mental or emotional impairment which has substantial [e]ffect on an individual's cognitive or volitional function." *Id*.

Under the policy, an unsound mind is defined as "[a] state of mind during which the person affected is unable to understand and appreciate the consequences of the proposed medical treatment or procedures so as to intelligently determine whether or not to consent to the same, regardless of whether such state of mind is only temporary or has existed for an extended period of time or occurs or has occurred only intermittently and whether or not it is due to natural state, age, shock or anxiety, illness, injury, drugs or sedation, intoxication, or other cause of whatever nature." *Id.* When medications are prescribed during an emergency situation, the prescribing physician must consult with a psychiatrist within twenty-four (24) hours following the decision. *Id.* at 2. In non-emergency situations, the policy requires that the inmate be afforded an "Involuntary Medication Hearing" and that he be given sufficient notice prior to such hearing. *Id*.

### III
### Findings of Fact

Pinkston has been diagnosed with various mental illnesses during his incarceration but Narcissistic Personality Disorder was his only current diagnosis when he arrived at MSP. Pinkston had no current prescriptions for any antipsychotic drugs nor had he taken such drugs in the past (at least during his incarceration). Pinkston has suffered skin issues since childhood but his skin condition worsened during incarceration.

Pinkston's participation in an alleged hunger strike necessitated his transfer to MSP. The alleged hunger strike, however, was largely a ruse and was done to bring attention to issues, both personal and institutional, which Pinkston believed needed to be addressed and resolved. Pinkston engaged in a number of alleged hunger strikes at different correctional facilities.

Upon transfer to MSP, Pinkston was placed in the hospital's psychiatric ward so that he could be continuously monitored. This particular ward also housed other inmates suffering a wide array of mental health issues. While at MSP, Pinkston met regularly with a treating psychiatrist. Although Pinkston undoubtedly exhibited manipulative, oppositional, demanding, and hostile behavior at times throughout his incarceration, he never harmed any staff members prior to nor during his stay at MSP.

On the morning of September 14, 2016, Pinkston awoke to find six boils on his inner thigh and groin area. He immediately sought medical attention but was unable to procure such help. This lack of medical treatment caused Pinkston to become upset as he began yelling, threatening the staff in some form, and beating on his cell door, all while confined in his cell. Pinkston's outburst stirred up his fellow inmates and they too began shouting and banging on their doors. Various staff members attempted to quell the situation without success.

Kuiper heard the raucous from his office downstairs and came up to gauge the situation.

16

Kuiper asked Pinkston more than once to settle down but the disruption continued. Kuiper then ordered that Pinkston be given injections of Haldol and Benadryl. Barron, accompanied by security, administered the injections in Pinkston's arm. Although the other inmates in the ward also participated in the disturbance, only Pinkston was injected with the medications. Pinkston did not consent to the injected medications.

Pinkston's behavior ceased shortly after the medications were given. Following the injections, Pinkston complained of a headache but no other side effects were noted in his medical records. Pinkston now complains of a number of other health issues, both physical and mental, resulting from the medications.

As Medical Director at MSP, Kuiper was responsible for complying with relevant MDOC policies, including the forcible medication policy. This policy typically required notice and a hearing prior to administering medications without the patient's consent. The policy did, however, provide for suspension of those requirements when an emergency situation was presented. It is undisputed that no notice was given, no hearing was held, nor did Kuiper discuss the decision with Pinkston's treating psychiatrist before ordering the injections for Pinkston.

## IV
## Conclusions of Law

As mentioned above, Pinkston's claims implicate the due process clause of the Fourteenth Amendment. "The touchstone of due process is protection of the individual against arbitrary action of government." *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 430 (5th Cir. 2017). The protections afforded by the due process clause take two forms, procedural and substantive. "When the fault lies in a denial of fundamental procedural fairness, the question is one of procedural due process." *Id.* (internal quotation marks omitted). "Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Marco*

*Outdoor Advert., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669, 672 n.3 (5th Cir. 2007) (internal quotation marks omitted). Both types of claims require a deprivation of a life, liberty, or property interest. *See Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016) (substantive due process); *Morris v. Livingston*, 739 F.3d 740, 749–50 (5th. Cir. 2014).

"The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990). Accordingly, prisoners have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221–22. While *Harper* dealt with the administration of antipsychotic drugs, its holding applies to forcible medication claims based on the administration of other types of drugs. *See Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th Cir. 1998) (administration of drug to control intracranial pressure); *Roper v. Grayson*, 81 F.3d 124, 125–26 (10th Cir. 1996) (administration of insulin).[4]

The due process rights recognized by *Harper* are violated if the state fails to satisfy any of the following three requirements.

> First, "the state must find that medication is in the prisoner's medical interest (independent of institutional concerns)." Second, "the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest."

---

[4] At least one district court has held that a "plaintiff's liberty interest in not being involuntarily medicated is surely not as strong when relatively innocuous, non-psychotropic medications are being forcibly administered." *Lombardo v. Stone*, No. 99-civ-4603, 2001 WL 940559, at *10 n.14 (S.D.N.Y. Aug. 20, 2001). This Court disagrees that a lower standard should apply to non-psychotropic drugs. While *Harper* involved the administration of antipsychotic medications, it referred broadly to the fact that a forcible injection of medication "represents a substantial interference with that person's liberty." 494 U.S. at 229. The two cases it cited for this proposition involved unwanted medical procedures, not the administration of psychotic drugs. *See Winston v. Lee*, 470 U.S. 753 (1985) (surgical operation to remove bullet); *Schmerber v. California*, 384 U.S. 757 (1966) (blood test). While the opinion referred to the specific risks associated with antipsychotic medications, it noted a conflict in the evidence and then prefaced further analysis with the phrase "[n]otwithstanding the risks that are involved." *Id.* at 230–31. When framed in this fashion, the type of medication does not modify the general interest at issue in forcible medication cases (the right not to have *any* kind of medicine forcibly administered). Rather, as explained more fully below, the type of medicine will impact the substantive due process inquiry as to whether the medicine was in the prisoner's medical interest.

> Third, "the prisoner must be able to argue capably before a review tribunal that he
> does not need forced medication."

*Perry v. Sims*, __ F.3d __, No. 19-1497, 2021 WL 800388, at *4 (7th Cir. Mar. 3, 2021) (internal

citations omitted). Analytically, the first of these requirements relates to a prisoner's substantive

due process rights while the latter two relate to procedural due process. *See Harper*, 494 U.S. at

220 ("[T]he substantive issue is what factual circumstances must exist before the State may

administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the

State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient.").

### A. Substantive Due Process

As explained above, the substantive due process element of the Fourteenth Amendment

prohibits a government from depriving a person of a protected interest without a sufficient reason.

When the right is not a "fundamental right" and the deprivation is individualized (rather than

applied broadly) the deprivation must "shock the conscience." *Reyes v. N. Tex. Tollway Auth.,

(NTTA)*, 861 F.3d 558, 562 (5th Cir. 2017). If the plaintiff is deprived of a fundamental right, a

court ordinarily must apply strict scrutiny to the decision by asking whether "the law is necessary

to further a compelling governmental interest and has been narrowly tailored to achieve that

interest." *Kovac v. Wray*, 363 F. Supp. 3d 721, 750 (N.D. Tex. 2019) (citing *Reno v. Flores*, 507

U.S. 292, 302 (1993)).

There can be no dispute that the right to bodily integrity is a fundamental right, *Oliver v.

Scott*, 276 F.3d 736, 744 (5th Cir. 2002), or that such right is violated by the forcible administration

of medication, *United States v. Brandon*, 158 F.3d 947, 957 (6th Cir. 1998). However, it does not

necessarily follow that all instances of forced medication are reviewed under the strict scrutiny

standard. Prison regulations need only be "reasonably related to legitimate penological interests"

"even when the constitutional right claimed to have been infringed is fundamental." *Harper*, 494

U.S. at 223. Thus, in *Harper*, the United States Supreme Court approved a forcible medication policy allowing for the forcible medication of inmates with a "mental disorder" who "as a result of that disorder" pose a "likelihood of serious harm" to themselves, others, or property. *Id.* at 215, 232–33. Furthermore, the Supreme Court has declined to expressly adopt a strict scrutiny standard with respect to the forcible administration of medication in the penological context. *See Riggins v. Nevada*, 504 U.S. 127, 136–37 (1992).

Given this Supreme Court authority, when, as here,[5] medication has been forcibly administered to address an alleged danger, the substantive due process inquiry asks whether the administration was in the prisoner's medical interest, an inquiry which focuses on whether the decisionmaker "had enough evidence to demonstrate that [the plaintiff] was a danger to himself or others so as to justify" the use of the medication which was administered. *Perry*, 2021 WL 800388, at *4. The danger inquiry may also consider the potential of serious harm to property. *Harper*, 494 U.S. at 232–33.[6]

Though Pinkston suffers from Narcissistic Personality Disorder, there is no indication this illness manifested itself in violent ways. Pinkston had no history, documented or otherwise, of harming staff. And while Pinkston admitted to an altercation with other inmates regarding theft of his property, there is no evidence tying this altercation to his illness nor are there other instances of violent behavior which would tend to show a pattern of such behavior.

Regarding the incident at issue, the evidence demonstrates that, for a few hours before

---

[5] Kuiper's explanation for prescribing Benadryl was two-fold: (1) as a precautionary matter, should Pinkston be allergic to Haldol, and (2) because of its tendency to have a sedative effect. Kuiper did not prescribe Benadryl to treat any of Pinkston's medical conditions.

[6] The Fourth Circuit seems to utilize a higher standard, requiring that the medications have been administered "without professional judgment." *Farabee v. Yaratha*, 801 F. App'x 97, 108 (4th Cir. 2020). This rule is based on the tenuous analogy comparing the interest to be free from bodily restraint with the interest in not being forcibly administered drugs. *See Johnson v. Silvers*, 742 F.2d 823, 825 (1984) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)). Because this Court does not believe the analogy to be a valid one, this Court declines to adopt the Fourth Circuit's rule.

being forcibly medicated, Pinkston's behavior included shouting and beating on his cell door, and that his shouts included some threats towards staff members. Pinkston's behavior certainly created a major disruption but not much beyond that. It is undisputed that Pinkston was locked in his cell during the entirety of his outburst, such that he posed no sincere threat of harm to staff nor to other inmates.

Kuiper made much of the fact that Pinkston's actions caused the other inmates to act out, as they began yelling and banging on doors as well. Pinkston's fellow inmates, however, were also locked in their cells and there is no indication that the actions of these inmates (to the extent they may be attributable to Pinkston himself) posed a risk of harm to anyone. Consequently, the Court does not understand the significance of the other inmates' actions, other than showing that it was a *loud* disruption, and loud noise in the ward was not exactly unusual, according to some of the testimony.

As to self-harm, it is true that Pinkston participated in a number of hunger strikes before his time at MSP, and claimed to be participating in one while at MSP. These so-called hunger strikes never resulted in any significant damage to Pinkston's well-being. Moreover, Barron testified that, at the time of the disruption, she did not believe Pinkston would harm himself. The Court also finds that there existed no legitimate concern that Pinkston would destroy state property, only a belief that that he could *possibly* flood his cell. Thus, the Court finds that the evidence presented does not support a finding that Pinkston posed a threat of harm to himself, others, or property. The forcible administration of the Haldol and Benadryl, therefore, violated Pinkston's substantive due process rights.

## B. Procedural Due Process

"At a minimum, due process requires that notice and an opportunity to be heard be granted

at a meaningful time and in a meaningful manner." *Gibson v. Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) (cleaned up). In the context of forcible medication, this means that the tribunal or panel approving the medication must exercise independent judgment and take into account the inmate's best interest and that the inmate have an adequate opportunity before the tribunal to object to the medication. *Perry*, 2021 WL 800388, at *4. Ordinarily, the failure to provide the required procedural protections before forcible administration of a drug will result in a violation of a plaintiff's procedural due process rights. *Id.* However, a prisoner is not entitled to such procedural protections when the circumstances suggest that he poses "such an imminent and serious danger to himself or others" that the defendant could not comply with the notice and hearing requirements.[7] *Kulas v. Valdez*, 159 F.3d 453, 456 (9th Cir. 1998); *see Brandt v. Monte*, 626 F. Supp. 2d 469, 489–90 (D.N.J. 2009) ("An emergency that is imminent or reasonably impending triggers the authority to involuntarily medicate within the bounds of due process.").

Courts which have found a situation sufficient to jettison procedural protections have done so only under extreme circumstances. *See Riddick v. Chevalier*, No. 3:11-cv-1555, 2013 WL 4823153, at *2 (D. Conn. Sept. 9, 2013) (no due process violation where plaintiff "was forcibly medicated on two occasions … when he was inflicting self-harm by striking himself repeatedly in the head with the lock on his restraints and banging his head against his cell door"); *Doe v. Dyett*, No. 84-civ-6251, 1993 WL 378867, at *3 (S.D.N.Y. Sept. 24, 1993) (no due process violation where plaintiff was forcibly medicated on occasions when he (1) assaulted corrections officers, banged his head in his cell and then cut himself with a pen; (2) cut himself and attempted to block officers from stopping the bleeding; and (3) attempted to electrocute himself). Being "loud and

---

[7] Consistent with this law, MDOC policy authorizes the forcible administration of medication in "emergent situations."

uncooperative" does not satisfy the emergency standard. *Kulas*, 159 F.3d at 456. Neither does the mere "appearance" of a danger. *Miskovitch v. Hostoffer*, 721 F. Supp. 2d 389, 410 (W.D. Pa. 2010).

This Court has already concluded that Pinkston, who was locked in his cell and was taking no action which could be considered self-harm, posed no risk to himself or others (imminent or otherwise). While he was undoubtedly being loud and disruptive, such conduct does not rise to the level of an emergency. Neither does the mere possibility that he may flood his cell. *See Brandt*, 626 F. Supp. 2d at 489 ("Medical authorities may not medicate involuntarily committed patients on the mere foreseeable possibility that a future emergency might arise."). Because Pinkston was not a danger to himself or others or property, he was entitled to a hearing and an opportunity to be heard before being forcibly medicated. Kuiper's refusal to provide these procedural protections resulted in a violation of Pinkston's procedural due process rights.

## C. Damages

Because Pinkston has proven that his due process rights were violated when he was forcibly medicated with Haldol and Benadryl, the Court must now address the matter of damages. In his original complaint, Pinkston did not request a specific damages amount but instead asked that "physical, mental and emotional damages [] be paid in full." Doc. # 1 at PageID 9.[8]

Because 42 U.S.C. § 1983 "creates a species of tort liability, … when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986) (cleaned up). As with general tort law, "the basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of

---

[8] The Court found no additional request for damages in Pinkston's subsequent amendments to the original complaint.

constitutional rights." *Id*. at 307 (cleaned up).  To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms but also such injuries as "impairment of reputation, personal humiliation, and mental anguish and suffering."  *Id*. (cleaned up).  But in the absence of proof of actual injury from a due process (or any constitutional) violation, a plaintiff is entitled to recover only nominal damages.  *Carey v. Piphus*, 435 U.S. 247, 248, 266 (1978).  Under the Prison Litigation Reform Act, a prisoner may not recover "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

During the hearing, Pinkston testified as to various side effects he claims were caused by the injections of Haldol and Benadryl, including headaches, blood pressure problems, lockjaw, increased itchiness in skin, throbbing in the left side of this head, vision problems, difficulty sleeping, difficulty controlling his thoughts, and heightened emotions.  Other than a medical note stating that Pinkston complained of a headache immediately following the injections and that he denied having a headache a few hours later, Pinkston submitted no corroborating medical evidence.  Nor did Pinkston offer any evidence which would corroborate his statement that employees were ordered not to document his health conditions.

Moreover, Pinkston's medical records show that he suffered from headaches (migraines) and blood pressure problems before the injections.  Thus, beyond Pinkston's testimony, the only evidence which would tend to show damages from the shots is the testimony of his family members that he acted differently after the incident.  However, in the absence of any evidence that Haldol or Benadryl can produce this type of long-term side effect based on the dosage amount given Pinkston, the Court gives such evidence from interested witnesses little weight.

Based on the evidence presented, the Court finds that Pinkston failed to prove that the injuries he complained of, to the extent they exist, were *caused* by the medications forcibly

administered. *See Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (reversing damages award where evidence of damages was uncorroborated and came "largely from [the plaintiff's] own testimony"). But as explained above, a plaintiff who has suffered a violation of a constitutional right will nonetheless be entitled to nominal damages. *Carey*, 435 U.S. at 267. While in 1978, the Supreme Court in *Carey* awarded one dollar in nominal damages, "[t]he Court did not indicate … that in 1978 one dollar was the outer limit of [nominal] damages." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003). Rather, a court may award nominal damages so long as the sum awarded is "insignificant." *Id*. Today, one hundred dollars is considered insignificant. *Id*. Thus, the Court finds that, although Pinkston has failed to establish a causal connection between the injuries alleged and the injections, he is nonetheless entitled to an award of $100.00 in nominal damages, which this Court deems an insignificant sum.

## V
## Conclusion

Pinkston has proven that Dr. Hendrick Kuiper violated his constitutional substantive and procedural due process rights when he ordered that Pinkston be forcibly medicated with Haldol and Benadryl. Pinkston is entitled to nominal damages in the amount of one hundred dollars ($100.00) to compensate for the constitutional violations. A separate final judgment will issue.

**SO ORDERED**, this 30th day of March, 2021.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**